41955. LIBERTY NATIONAL LIFE INSURANCE COMPANY v. LINER.

SUBMITTED APRIL 6, 1966—DECIDED MAY 10, 1966—
REHEARING DENIED MAY 24, 1966—

Henry A. Stewart, Sr., for appellant.
Howe & Murphy, Don B. Howe, James I. Parker, for appellee.

FELTON, Chief Judge. The plaintiff had the burden of proving her allegation that the insured's death resulted from accidental injury as defined by the policy. The policy defines accidental injury as "bodily injury effected solely through external and accidental means" and provides that "the benefit for natural death will be payable in lieu of the accidental death benefit: . . . (3) if the injury or death is caused or contributed to by . . . (d) participation in an assault or felony."

The evidence showed substantially as follows: There were no eyewitnesses to the deaths of the insured and his brother, who were the sole occupants of the particular area of the jail in which they were confined on charges of driving under the influence and in which the fire started (a colored prisoner occupied an adjoining area, separated by a masonry wall). The area of their confinement was known as the "bull pen," within which were two individual cells. The insured was assigned to the back, or number 2, cell and his brother to the front, or number 1, cell. Both cells were unlocked, giving both prisoners free access to the whole area within the bull pen, including both cells. The ceiling of the bull pen was covered with strips of tin, approximately 29 to 36 inches by 6 feet in size. There was a window in the bull pen which had been boarded up from the outside. Both the window and the ceiling were intact when the prisoners were committed. Approximately an hour or an hour and a half before the fire started, the prisoner in the adjoining area heard, for about 5 minutes, a sound like "a tin cup going across some bars" coming from within the bull pen. After the fire was brought under control, a strip of the ceiling tin, which came from the area just inside the main entrance to the bull pen, was found on the floor underneath the bunk in the insured's cell, along with a section of the wooden window sash. The fire started in the vicinity of the removed ceiling strip, either on or within the ceiling or in an empty room above, which had formerly been used for the storage of civil defense supplies. None of the witnesses, including an expert, knew the cause of the fire, although faulty wiring was said to be eliminated as the cause. There was speculation that the force of the fire hose might have knocked the window sash and even the tin ceiling strip off and that the water

standing on the floor might have caused various objects to float around within the area. The deputy State fire marshal testified that the ceiling strips evidenced a bending which indicated to him that attempts had been made to pry it loose. He also expressed the opinion that the tin strip found under the insured's bunk would have had to get there by being carried, for the reason that, in order for it to have floated to that location it would have had to make a 90-degree turn and go through the narrow cell door, which was barely wider than the tin strip. He admitted that he didn't know whether the tin was pulled off before the fire started or in the process of extinguishing the fire. The insured and his brother were both found dead within their respective assigned cells after the fire was brought under control sufficiently to enter the bull pen. A cigarette lighter was found on the body of each prisoner. In the insured's cell was found a brown paper sack, which had been twisted and burned on one end, as if it might have been used to start a fire, and there was smoke on the middle of the bottom edge of the lower bunk. In his brother's cell were found various scraps of charred paper, some apparently from a billfold, and a book of matches with all the heads burned.

There are two inconsistent theories, both of which can be reasonably based upon the evidence, which was entirely circumstantial. First, that the insured was the innocent victim of a fire caused by accidental means and, second, that the insured deliberately started the fire himself. Even if the two theories are equally reasonable, which is not conceded, the established rule is that where circumstantial evidence is relied upon to establish a conclusion and the uncontradicted circumstantial evidence gives equal support to inconsistent conclusions or theories, the judgment as a matter of law must go against the party having the burden of proof. *Collins v. Phillips,* 99 Ga. App. 13 (107 SE2d 275); *Carpenter v. Lockheed Aircraft Corp.,* 93 Ga. App. 213 (91 SE2d 199); *Sixth St. Corp. v. Daniel,* 80 Ga. App. 680 (57 SE2d 210); *Herman v. Aetna Cas. & Surety Co.,* 71 Ga. App. 464 (31 SE2d 100); *Overstreet v. Metropolitan Life Ins. Co.,* 69 Ga. App. 459 (26 SE2d 115); *Griffin v. Blackshear Bank,* 66 Ga. App. 821 (19 SE2d 325); 32A CJS 639, 748, Evidence,

§§ 1019(b), 1039; 20 Am. Jur. 1041, 1043, Evidence, § 1189. "[L]iability can not be imposed merely because the actual circumstances are incapable of proof. It is more consistent with legal justice that a given case should fail for want of evidence than that it should succeed merely because the truth can not be shown." *Savannah River Lmbr. Co. v. Bush*, 37 Ga. App. 539, 541 (140 SE 899). The cases holding that "an injury is presumed to be the result of accident rather than design," (*Gaynor v. Travelers Ins. Co.*, 12 Ga. App. 601, 603 (77 SE 1072); *McLendon v. Carolina Life Ins. Co.*, 71 Ga. App. 557, 558 (31 SE2d 429)), and that "where nothing but the fact that burning appears it is presumed that the fire resulted from accidental or providential cause," (*Progressive Life Ins. Co. v. Smith*, 71 Ga. App. 157, 162 (30 SE2d 411)), do not apply so as to change the result here, since in the present case there is additional evidence beyond merely that there was a fire and an injury. There was evidence from which it might have been found that the insured had pried the tin strip off the ceiling, possibly with the aid of the piece of window sash, placed it under his bunk, twisted the brown piece of paper or sack on one end, lighted it with his cigarette lighter and held it up to the exposed wooden parts of the ceiling to start the fire—possibly in the hope of escaping in the confusion of the fire. There would have been no apparent reason for using the twisted paper for any other purpose, since both prisoners had cigarette lighters with which to light their cigarettes. The fact that the brother had equal access to the point of origin of the fire does not weaken this theory of the evidence. It is highly improbable that the brother, even if not actively participating in the felonious act of arson, did not know of or acquiesce in the act, or that he could not have intervened in some manner to prevent such act if he had so desired. The evidence in favor of arson was at least as strong as that against it, especially in view of the fact that there were no eyewitnesses to the starting of the fire and no evidence of any alternative possible causes of the fire.

It follows that the plaintiff failed to carry the burden of proof of death resulting from accidental injury and, therefore, that the verdict and judgment in favor of the plaintiff were not authorized by the evidence.

*Judgment reversed. Frankum, J., concurs. Pannell, J., concurs in the judgment.*